**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHIRLEY SHERIDAN, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **NGK METALS CORPORATION, et al.,** | : | |
| **Defendants** | : | **No. 06-5510** |

**M E M O R A N D U M**

PRATTER, J.                                                                        SEPTEMBER __, 2008

**INTRODUCTION**

      The crux of the pending issue in this putative class action is whether an individual's exposure to beryllium (beyond some threshold level) is sufficient to permit the conclusion that the affected individual has a "significantly increased risk" of contracting a beryllium-related disease.  Plaintiff James Zimmerman[1] contends that his exposure to beryllium puts him at risk of contracting chronic beryllium disease, while Defendants NGK Metals Corporation and Cabot Corporation contend that an individual seeking "medical monitoring" must be "sensitized" to beryllium in order to "significantly increase" his or her risk of contracting CBD.  The Defendants base their summary judgment motion on this argument.  Mr. Zimmerman opposes the motion. For the reasons discussed below, Defendants' motion will be granted.

---

      [1] Mr. Zimmerman's co-plaintiff, Shirley Sheridan, is not involved in the issues posed in or by the present motion.  Ms. Sheridan's status in this action is addressed infra, at footnote 5 and the accompanying text.

**FACTUAL AND PROCEDURAL BACKGROUND**[2]

Mr. Zimmerman, along with his co-plaintiff, Shirley Sheridan, seeks to establish a fund to provide medical monitoring to a certain class of residents of Reading, Pennsylvania who were exposed to beryllium particulate released from a Reading manufacturing facility (the "Reading Plant") that was owned and operated by the Defendants.[3]  Mr. Zimmerman resided within one mile of the Reading Plant for seven years, from 1977 to 1984.  He did not work at the Reading Plant, and the record demonstrates no other connection with the Plant or other basis for exposure to beryllium.  Mr. Zimmerman argues that he has a "significantly increased risk" of developing an adverse beryllium-related health effect, including chronic beryllium disease, or "CBD," due to his exposure to beryllium.

---

[2] The parties did not follow the Court's General Trial and Pretrial Procedures with respect to statements of fact in summary judgment motions and responses.  These Procedures require the party moving for summary judgment to include in the motion papers a numbered paragraph-by-paragraph recitation of facts with specific citations to the record for the support of such facts, and, correspondingly, a party opposing summary judgment must state in similar paragraph form agreement or disagreement with the facts as stated by the moving party. This procedure is designed to allow the Court to consider with clarity which facts are disputed and which are not.

Often when the parties ignore these procedures, the Court simply denies the motion without prejudice, allowing the parties to revisit the process anew in compliance with the Procedures.  However, here the factual basis for the Defendants' motion is straightforward and, in large part, not disputed.  The parties dispute the evidentiary value of the Plaintiff's various experts' reports, the available medical and scientific data regarding beryllium exposure, and the continuum of beryllium-related health effects that result from such exposure.  Accordingly, although the Court admonishes counsel that failure to follow the Procedures should not be routinely considered to be a circumstance without consequence, in this instance the Court will proceed to address and resolve the disputed motion without requiring curative measures by the parties.

[3] From 1986 through 2001, the Reading Plant was owned and operated by NGK Metals Corporation.  Prior to 1986, for a period of at least 50 years, the Reading Plant was owned and operated by Cabot Corporation.

Beryllium is a known hazardous substance.  CBD results from the human body's abnormal immunologic response to beryllium.  According to one of Mr. Zimmerman's medical experts, "CBD is a multi-system disorder featuring the development of granulomatous inflammation after exposure and subsequent sensitization to the metal beryllium."

This abnormal immunologic response to beryllium is called "beryllium sensitization," or "BeS."  BeS is not itself a disease.  It does not cause any symptoms or abnormal lung function or impairment; it requires no treatment.  However, medical research indicates that beryllium sensitization is a necessary precursor to CBD.  In other words, only individuals who are exposed to beryllium (above some threshold level) and are "sensitized" to beryllium can contract CBD.[4]  However, the converse is not true, i.e., it is possible that an individual who is both exposed to and sensitized to beryllium will not develop CBD.

Sensitization to beryllium can be detected via an immunologic test known as the Beryllium Lymphocyte Proliferation Test, or "BeLPT."  A BeLPT is a laboratory test used to determine whether a person's blood or lung fluid is sensitized to beryllium by measuring the proliferative response, if any, of lymphocytes extracted from blood or lung fluid and exposed to beryllium in vitro.  An individual with two confirmed abnormal (or positive) blood BeLPTs is classified as beryllium sensitized.  Alternatively, an individual who tests positive on a single bronchoalveolar lavage BeLPT also is considered sensitized.

In 2003, Mr. Zimmerman tested positive on a single blood BeLPT.

In 2006, Dr. Milton Rossman of the Hospital of the University of Pennsylvania performed

---

[4] Plaintiff characterizes BeS as "the beginning of the disease process, since nearly everyone who is sensitized will eventually go on to develop CBD."  (Pl. Resp. ¶ 4.)

3

another blood BeLPT on Mr. Zimmerman, which came back negative.  In addition, a lavage

BeLPT performed on Mr. Zimmerman in June 2006 also returned negative results.

   According to these tests results, as of June 2006 Mr. Zimmerman was not "sensitized" to

beryllium, i.e., he had not developed BeS.  Since mid-2006 Mr. Zimmerman has not undergone

any repeat BeLPTs.  It is undisputed that as of the date of this Memorandum, there is no

evidence, or indication, or suggestion that Mr. Zimmerman has BeS or CBD.

   Shortly after the inception of this litigation, discovery was bifurcated so that discovery

related to the issue of class certification would be completed prior to "merits" discovery.  In

December 2007, following the completion of class certification discovery, Mr. Zimmerman and

Ms. Sheridan, individually and as representatives for the putative class, moved for class

certification.[5]  Ms. Sheridan's claims against Cabot have since been dismissed, while her claims

against NGK Metals remain.  Instead of responding to the Plaintiffs' motion to certify a class,

Cabot and NGK Metals moved for summary judgment, arguing that Mr. Zimmerman has failed

to establish the requisite elements of a claim for medical monitoring.  The motion is fully briefed,

and the Court received oral arguments on the motion on September 5, 2008.

**LEGAL STANDARD**

   Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

---

   [5] Cabot Corporation obtained a judgment on the pleadings against Plaintiff Shirley
Sheridan on May 21, 2008, when the Court dismissed Ms. Sheridan's claim against Cabot on res
judicata grounds.  (See Docket No. 111.)  Ms. Sheridan's medical monitoring claim against NGK
Metals remains and is not at issue here.

judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).   An issue is "genuine" if a reasonable fact-finder could possibly hold in the non-movant's favor with regard to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law.  Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

**DISCUSSION**

Under Pennsylvania common law, a plaintiff must prove the following in order to secure medical-monitoring relief:

1.      exposure greater than normal background levels;

2.      to a proven hazardous substance;

3.      caused by the defendant's negligence;

4.      as a proximate result of the exposure, plaintiff has a <u>significantly increased risk</u> of contracting a serious latent disease;

5.      a monitoring procedure exists that makes the early detection of the disease possible;

6.      the prescribed monitoring regime is different from that normally recommended in  the absence of the exposure; and

7.      the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

<u>Redland Soccer Club v. Dep't of the Army</u>, 696 A.2d 137, 145-46 (Pa. 1997) (emphasis added). Proof of these elements requires expert testimony.  <u>Id.</u> at 146.

The fourth element is our focus now, namely, whether the record evidence indicates that due to his exposure to beryllium, Mr. Zimmerman has a "significantly increased risk" of contracting CBD.  Defendants argue that under Pennsylvania law, a plaintiff cannot maintain a medical monitoring claim for exposure to beryllium unless he establishes that he is "sensitized" to beryllium.  Because Mr. Zimmerman is not sensitized to beryllium, Defendants argue, he cannot maintain a medical monitoring claim.

As an initial matter, the Court notes that in raising these arguments, Defendants have not submitted any expert reports of their own.  Instead, pointing to Mr. Zimmerman's proffered

6

experts' reports, Defendants rely almost entirely on one recent case from the Pennsylvania

Superior Court, <u>Pohl v. NGK Metals Corporation</u>, 936 A.2d 43 (Pa. Super. Ct. 2007), <u>allocatur</u>

<u>denied</u>, 952 A.2d 678 (Pa. 2008) (per curiam).[6]  Defendants argue that based on the "clarity" of

Pennsylvania law as announced in <u>Pohl</u>, and on the lack of proofs contained in the Plaintiffs'

experts' reports, Mr. Zimmerman's medical monitoring claim must fail as a matter of law.

**I.     THE <u>POHL</u> CASE**

In <u>Pohl</u>, the trial court entered summary judgment in favor of the defendants, finding that

the plaintiffs failed to establish they were at a "significantly increased risk" of contracting CBD,

and the Superior Court affirmed.[7]  Recently, in June 2008, the Supreme Court of Pennsylvania

denied <u>allocatur</u>, effectively disposing of the plaintiffs' appeal and their claims.

Like Mr. Zimmerman, the plaintiffs in <u>Pohl</u> sought medical monitoring due to their

exposure to beryllium emitted by the Reading Plant.  Those plaintiffs, like Mr. Zimmerman,

resided within one mile of the Plant.  Finally, none of the <u>Pohl</u> plaintiffs, like Mr. Zimmerman,

was "sensitized" to beryllium.

The Superior Court rejected the plaintiffs' argument, and the expert testimony with which

_____

[6] The <u>Pohl</u> decision was a recent victory (at the trial court level and on appeal) for the same Defendants in this case, who were represented by the same counsel as are their attorneys here, against three individual plaintiffs, who were also represented by the same counsel as are representing Mr. Zimmerman in this case.

[7] The trial court had denied the <u>Pohl</u> plaintiffs' motion for class certification, and, thereafter, plaintiffs pursued their claims individually.  The trial court's decision on summary judgment, and the Superior Court's affirmance, rejected the three individual plaintiffs' respective claims.

plaintiffs supported their argument,[8] that they have a "significantly increased risk" of contracting CBD. The significance of the <u>Pohl</u> court's ruling, which Mr. Zimmerman challenges here, is the court's holding that only individuals who are "sensitized" to beryllium have a "significantly increased risk" of contracting CBD, and, therefore, that only "sensitized" individuals can maintain an action for medical monitoring under Pennsylvania law.

<u>Pohl</u> has such a potentially significant role in this case that extensive quotation from that opinion merits inclusion here. The Superior Court stated:

> Instantly, [Appellants/Plaintiffs] presented expert testimony regarding whether Appellants face a significantly increased risk of contracting CBD. Dr. Maier testified that CBD results from a body's immunologic response to beryllium exposure. This immunologic response is similar to an allergy, in that only those individuals genetically predisposed to this reaction may contract beryllium sensitivity upon exposure. Additionally, Appellants' expert, Dr. Maier, testified that beryllium sensitization is a necessary precursor to developing CBD:

>> [DEFENSE COUNSEL]: And you contend, I think in your affidavits and certainly in your published materials, that [CBD] is in all cases preceded by this immunologic response.
>> [WITNESS]: That is what we have learned looking at the natural history of beryllium sensitization; yes.
>> [DEFENSE COUNSEL]: And that is what your current view is, that beryllium sensitization is a necessary precursor to [CBD]?
>> [WITNESS]: It develops with it or before it is the current medical understanding.
>> [DEFENSE COUNSEL]: But that's the progression of the disease, that the body would recognize the beryllium as a foreign body, it's attacked by the body's defense mechanism, and treats it as a foreign body so you will get sensitization that may or may not lead to [CBD]?
>> [WITNESS]: That is correct.
>> [DEFENSE COUNSEL]: But you need sensitization,

---

[8] A point that was not lost on the Defendants in this case is that the plaintiffs' experts in <u>Pohl</u> – Lisa A. Maier, M.D., MSPH, John W. Martyny, Ph.D, C.I.H. and Milton Rossman, M.D. – are all relied upon by Mr. Zimmerman here. Whether these experts' reports and opinions are identical to or refined beyond their opinions in <u>Pohl</u> is addressed <u>infra</u>.

assuming accuracy of a test, in order to get [CBD]?

[WITNESS]: Yes. Some people, when we have diagnosed them with sensitization, already have [CBD] but it is assumed that that preceded, sensitization preceded.

* * *

[DEFENSE COUNSEL]: [I]f you are not sensitized, then you're not going to get [CBD]?

[WITNESS]: If you're not sensitized now or don't become sensitized in the future.

[DEFENSE COUNSEL]:  You will not get [CBD].

[WITNESS]: Correct.

Dr. Maier testified that a negative BeLPT does not preclude the possibility that an individual is beryllium sensitized.  Dr. Maier also explained that a small percentage of individuals who do not demonstrate beryllium sensitivity on their BeLPT may be a result of a false negative reading.

Appellants' next expert, Dr. Martyny, testified he could not determine whether Appellants were at a significantly increased risk of contracting CBD. Although Dr. Martyny indicated that exposure to beryllium at background levels above normal does create a risk, he could not determine whether the risk is significant.

Appellants' third expert, Dr. Rossman, testified to the number of individuals exposed to beryllium who may later contract CBD. Dr. Rossman indicated that between one and three percent of an exposed population might become beryllium sensitized.  Dr. Rossman also explained that approximately one-half of the individuals who become beryllium sensitized might contract CBD. Of those individuals who might contract CBD, approximately one-half might actually require treatment.

[Appellees/Defendants] also presented expert witnesses at the class certification hearing. Appellees' expert Dr. Harbison testified that a diagnosis of CBD requires an abnormal BeLPT.  Additionally, both Dr. Harbison and Appellees' second expert, Dr. Sandler, agreed there is no methodology to support the claim that Appellants, as well as the other members of their class action suit, were at a significantly increased risk of contracting CBD.

Throughout the class certification hearings, both Appellants' and Appellees' experts discussed the difference between beryllium susceptibility and beryllium sensitivity. Approximately thirty-five to forty percent of the general population has some type of beryllium susceptibility. However, Dr. Maier indicated the concept of

> beryllium susceptibility is only a hypothesis. Dr. Maier also testified that there is currently no test available to determine whether an individual is "susceptible" to an adverse beryllium health effect. Dr. Maier admitted she could not positively determine whether Appellants were susceptible to beryllium. Another of Appellants' experts, Dr. Sandler, echoed this viewpoint. Dr. Sandler testified that he was unaware of any test available to determine which individuals are susceptible to adverse beryllium health effects.

Pohl, 936 A.2d at 50-51 (internal citations and footnotes omitted).  The Pohl court concluded:

> This record provides no support for Appellants' contention that they are sensitive to beryllium or face a significantly increased risk of contracting CBD. Additionally, Appellants cannot show they are even susceptible to beryllium, because beryllium susceptibility cannot be determined by a test.  Even if a test were available to prove Appellants are susceptible to beryllium, no expert testimony supports Appellants' claim that susceptibility, absent beryllium sensitivity, creates a significantly increased risk of contracting CBD. At the time of the class certification hearings, Appellants Dondore and Bare had tested negative for beryllium sensitivity. Appellant Pohl still has not even been tested.

> At the July 11, 2005 hearing on Appellees' summary judgment motion, the court offered Appellants the opportunity to undergo additional BeLPT testing to supplement the record. Appellants, however, refused the offer. In light of the expert testimony, as well as Appellants' failure to demonstrate beryllium sensitivity through positive BeLPT results, Appellants cannot show they face a significantly increased risk of developing CBD.  As such, Appellants failed to produce evidence of facts essential to their cause of action for medical monitoring. Thus, the record in this case supports summary judgment, because it contains insufficient evidence to make out a prima facie cause of action, and there is no issue to be submitted to the jury.

Id. at 51-52 (internal citations and footnote omitted).  The court held that because the plaintiffs

could not prove that they were "sensitized" to beryllium, they "failed to establish that they are at

a significantly increased risk of contracting CBD, which is a required element of their cause of

action for medical monitoring."  Id. at 52.  The Pohl court noted that the plaintiffs "are free to

bring another action for medical monitoring *if and when they have a positive BeLPT or develop*

*CBD*."  Id. at 52 n.3 (emphasis added).

As noted in the quoted text, two of the Pohl plaintiffs had tested negative for beryllium

10

sensitivity using BeLPTs, and one plaintiff had never been tested.  Thus, none of the <u>Pohl</u>

plaintiffs were documented as "sensitized" to beryllium.  Neither is Mr. Zimmerman beryllium

sensitized, yet he argues that <u>Pohl</u> is distinguishable because, he claims, "[t]he <u>Pohl</u> plaintiffs'

cases were dismissed because of a fundamental failure of proofs."  (Pl. Mem. Opp'n 23.)

## II.   MR. ZIMMERMAN'S PROOFS IN THIS CASE

In this case, Mr. Zimmerman emphasizes the different proofs at issue in this case as

compared to those in <u>Pohl</u>, and he encourages the Court to consider (1) factual differences in the

record evidence, namely, his BeLPT results; (2) "new" medical and scientific evidence regarding

beryllium-related health effects that was not made part of the record in <u>Pohl</u>; and (3) differences

between the expert testimony introduced in <u>Pohl</u> and the record evidence here.

### A.   Mr. Zimmerman's Test Results – Dr. Rossman's Testimony

Mr. Zimmerman first notes that none of the <u>Pohl</u> plaintiffs had shown a beryllium

sensitivity – one plaintiff had never taken the BeLPT and two plaintiffs had taken the test and

received negative results.  By supposed contrast, Mr. Zimmerman has undergone two BeLPTs,

once in 2003 when he tested positive, or at least registering an "abnormal" response to beryllium,

and again in 2006 when he tested negative.  Mr. Zimmerman argues that these results suggest

that he is a "borderline" case that requires medical monitoring.  He offers an affidavit from Dr.

Rossman, who opines that despite Mr. Zimmerman's most recent negative BeLPT results (in

2006), he remains "significantly" at risk of contracting CBD.

Dr. Rossman examined Mr. Zimmerman once in June 2006.  At that time, he performed

certain tests designed to determine, if possible, whether Mr. Zimmerman was "sensitized" to

beryllium, including proliferation studies (BeLPTs), pulmonary function studies, and

transbronchial biopsies.  None of the tests indicated BeS or CBD.  However, at that time Dr. Rossman concluded that "because of the borderline results, it would be recommended that those studies be repeated if clinically indicated," i.e., if Mr. Zimmerman exhibited symptoms.  (Pl. Mem. Opp'n Ex. 7, Rossman Aff. ¶ 4.)  He did not, however, specifically advise Mr. Zimmerman to undergo a repeat BeLPT.  Mr. Zimmerman presents no evidence of manifested symptoms.

When he was deposed in this case in 2008, Dr. Rossman reiterated his opinion as to Mr. Zimmerman's need to undergo medical monitoring, and explicitly stated that Mr. Zimmerman should have repeat BeLPTs performed every three to five years for the rest of his life.  (Pl. Mem. Opp'n Ex. 7, Rossman Aff. ¶ 5.)  Dr. Rossman stated that he recommended this course of medical monitoring "because of the exposure to beryllium that Mr. Zimmerman has had from the Reading beryllium plant, which created in him . . .  a significantly increased risk of contracting CBD in relation to any unexposed population."  (Pl. Mem. Opp'n Ex. 7, Rossman Aff. ¶ 6.)  Dr. Rossman concluded:

> I can categorically state that one does not need to be diagnosed with BeS in order to be considered significantly at risk for contracting CBD.  Indeed, the very purpose of medical monitoring of beryllium-exposed persons is to determine at the earliest juncture whether they have BeS or CBD and, thus, monitoring by use of the blood BeLPT is only useful before BeS is diagnosed since by definition, individuals with BeS have a positive BeLPT.  Mr. Zimmerman has such risk and will unfortunately have it for the rest of his life.

(Pl. Mem. Opp'n Ex. 7, Rossman Aff. ¶ 7.)

Mr. Zimmerman relies heavily on Dr. Rossman's conclusions as to his need for ongoing

medical monitoring,[9] while Defendants argue that Dr. Rossman's testimony is conclusory and should be rejected.  They argue that Mr. Zimmerman, through reliance on Dr. Rossman's testimony, is attempting to redefine the concept of "significantly increased risk" in order to circumvent Pohl's holding.

**B.      Plaintiff's Definition of "Significantly Increased Risk" – Dr. Martyny's Testimony**

As outlined above, the Defendants claim that Mr. Zimmerman is attempting to buttress Dr. Rossman's testimony that exposure to beryllium requires medical monitoring by redefining the concept of a "significantly increased risk."  Indeed, Mr. Zimmerman does urge the Court to ignore the holding in Pohl that a "significantly increased risk" in the context of beryllium exposure requires a plaintiff to establish that he or she is "sensitized" to beryllium.  Instead, Mr. Zimmerman wants the Court to look elsewhere.

Mr. Zimmerman invokes Foust v. SEPTA, 756 A.2d 112 (Pa. Commw. Ct. 2000), as an example of "considerable direction in defining what a significantly increased risk is in the context of another medical monitoring class action for exposures to PCBs."  (Pl. Mem. Opp'n 12.)  In Foust, the court examined statements from experts to the effect that exposure to "x" amount of a harmful toxin – "x" being an amount sufficient to produce the undesirable effect – places the class and/or an individual member of the class at a significantly increased risk of

---

[9] In June 2006, Dr. Rossman recommended that Mr. Zimmerman undergo a host of studies and evaluations at the Hospital of the University of Pennsylvania in order to detect CBD or other inflammatory lung diseases.  Notably, however, despite Mr. Zimmerman's reliance on Dr. Rossman's opinions for purposes of opposing Defendants' motion for summary judgment, there is no indication in the record before the Court that after June 2006 Mr. Zimmerman has sought treatment from Dr. Rossman (or any other physician) as a result of his exposure to beryllium.

contracting a latent disease.  The court held that experts need not "individualize" their testimony to a group of individuals with a common characteristic so long as the expert testifies that the risk to each member of the group is significant.  <u>Foust</u>, 756 A.2d at 119-20.

The reason for Mr. Zimmerman's reference to <u>Foust</u>'s acceptance of "generalized" expert testimony (as opposed to "individualized" expert testimony) is obvious, considering that Dr. Rossman is the only expert in this case who has opined as to Mr. Zimmerman's condition in particular.  Mr. Zimmerman relies on <u>Foust</u> (as well as his experts) to argue that exposure to beryllium alone is sufficient to maintain a medical monitoring claim, advancing the proposition that exposure to "x" amount of beryllium places him at a "significantly increased risk" of contracting an "adverse beryllium health effect."  In support of this theory, Mr. Zimmerman offers an expert report from John W. Martyny, Ph.D, C.I.H., who opined that the levels of beryllium within one mile of the Reading Plant exceeded the community standard of $0.01$ $\mu g/m^3$. Mr. Zimmerman argues that this excessive reading satisfies the "x" factor under <u>Foust</u>, and notes that Dr. Martyny concluded that the levels of beryllium emissions from the Reading Plant were of sufficient magnitude and duration to result in cases of CBD among individuals within the neighboring community.

The Court need not decide whether Mr. Zimmerman has posed a definition of "significantly increased risk" that amounts to a distinction that makes a difference.  As discussed below, the absence of other determinative distinctions or differences have greater impact upon the outcome of the pending motion.

C.    **"New" Science Since <u>Pohl</u>**

Mr. Zimmerman argues that the applicable science has changed since <u>Pohl</u>.  He claims

that "evidence is now unequivocal that BeS and CBD are each adverse beryllium health effects that require monitoring."  (Pl. Mem. Opp'n 27.)  Specifically, he refers to a "new" article, entitled "Beryllium Sensitization Progresses to Chronic Beryllium Disease: A Longitudinal Study of Disease Risk," by Lee S. Newman, Margaret M. Mroz, Ronald Balkissoon and Lisa A. Maier, originally published on September 16, 2004.  (Pl. Mem. Opp'n Ex. 4.)[10]

The authors of this 2004 article hypothesize that most beryllium-sensitized individuals will eventually develop CBD, and their conclusion, which is summarized on the first page of the article, is that "beryllium sensitization is an adverse health effect in beryllium-exposed workers and merits medical follow-up."  (Pl. Mem. Opp'n Ex. 4 at 1.)  Relying on this article, Mr. Zimmerman advances the proposition that BeS is an immunologic "injury" in and of itself, and is a prognostic statement about the person diagnosed with such a condition because, he argues, "virtually all people who become sensitized will develop CBD."  (Pl. Mem. Opp'n 27.)  He uses the article to advance his argument that modern science recently accepted – or at least realized – that the duration of time between the point when an individual develops BeS and the point when he develops full-blown CBD can be short.  Thus, he argues, beryllium sensitization is not merely a necessary precursor to CBD, as Dr. Maier testified in Pohl, but is actually most properly seen as the beginning of the disease process, i.e., BeS can progress to CBD so rapidly (in some cases) that BeS is essentially the onset of full-blown CBD.

_____

[10] Even though the Superior Court panel decided Pohl in 2007, and thus, feasibly could have accessed this "new" 2004 research, Mr. Zimmerman notes that the appellate panel reviewed the record that was originally created during the 2003 trial court proceedings, which Mr. Zimmerman notes "was never supplemented."  (Pl. Mem. Opp'n 27 n.8.)

D.      **Other Expert Testimony**

1.      *Dr. Glazer*

Mr. Zimmerman offers a declaration from Craig S. Glazer, M.D., MSPH, who also opines, essentially, that exposure equals risk.  Dr. Glazer stated that screening for beryllium-related diseases cannot begin with BeS because the risk attaches to beryllium exposure <u>before</u> BeS is detected.  While Dr. Glazer stated that "[a]ll individuals exposed to beryllium are at risk for the development of beryllium related health effects" (Glazer ¶ 7), certainly he stopped short of stating that all exposed individuals are at risk of developing BeS or CBD.  Neither did he assert that all exposed individuals are at a "significantly increased risk" of developing any disease.  His testimony merely states the tautology that only individuals who have been exposed to beryllium are at risk to develop a beryllium related health effect.  He is unable to quantify the risk posed to exposed individuals.

2.      *Dr. Maier*

Dr. Maier, whose conclusions were rejected in <u>Pohl</u>, submitted a declaration in which she stated generally that an individual who had one abnormal BeLPT, such as Mr. Zimmerman, should have a BeLPT every three to five years for life.

3.      *Dr. Finkel*

Finally, Mr. Zimmerman offers testimony from Adam M. Finkel, Sc.D., M.P.P., an epidemiologist, industrial hygienist and quantitative risk assessor, who performed a risk analysis of the community surrounding the Reading Plant.  Dr. Finkel concluded that beryllium concentrations in the Reading Plant community exceed natural background exposures in the United States.  He also concluded that "[b]y every numerical benchmark available to gauge

16

whether a risk of a given magnitude is 'significant,' the risk to the proposed class . . . is clearly significant."  (Pl. Mem. Opp'n Ex. 12, Finkel Decl. ¶ 46.)

In sum, Mr. Zimmerman relies on (1) the fact that none of the plaintiffs in <u>Pohl</u> had ever tested positive on a BeLPT, while at least his one 2003 BeLPT was positive; (2) his experts' opinions that the level of exposure to individuals residing within one mile of the Reading Plant, like Mr. Zimmerman, puts these individuals at a "significantly increased risk" of contracting CBD; and (3) "new" science indicating that, as the <u>Pohl</u> plaintiffs also argued, monitoring after BeS is detected is too late because individuals who have developed BeS likely will contract CBD.

## II.   Is <u>Pohl</u> Controlling?

Under <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64 (1938),[11] a federal court is bound to follow state law as announced by the highest state court.  <u>Edwards v. Hovensa, LLC</u>, 497 F.3d 355, 361 (3d Cir. 2007).  "If the highest court has not spoken to the issue, [federal courts] can garner assistance from the decisions of the state's intermediate appellate courts in predicting how the state's highest court would rule." <u>Mosley v. Wilson</u>, 102 F.3d 85, 92 (3d Cir. 1996).  While intermediate state appellate court decisions are not "automatically controlling," <u>Edwards</u>, 497 F.3d at 361 (<u>citing</u> <u>Paoletto v. Beech Aircraft Corp.</u>, 464 F.2d 976 (3d Cir. 1972)), those decisions "should be attributed some weight."  <u>Comm'r v. Estate of Bosch</u>, 387 U.S. 456, 465

_____

[11] In its landmark <u>Erie</u> decision, the Supreme Court held that when no federal statute applies and the legal issue at hand is substantive (as opposed to procedural), federal courts must apply state law.  <u>Erie</u>, 304 U.S. at 78.  Here, the issue of whether an individual's exposure to beryllium (beyond some threshold level) is sufficient to permit a fact-finder to conclude that the affected individual has a "significantly increased risk" of contracting a beryllium-related disease is quite clearly a substantive issue.

(1966).  "[A]n intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."   West v. A.T.&T. Co., 311 U.S. 223, 237 (1940).  In Pennsylvania, unless and until the Superior Court's decision is overruled by the Supreme Court of Pennsylvania, it remains the law of the Commonwealth.  See Pennsylvania v. Martin, 727 A.2d 1136, 1141 (Pa. Super. Ct. 1999) ("It is well-settled . . . that until the Supreme Court overrules a decision of this Court, our decision is the law of this Commonwealth.") (citing Pennsylvania v. Leib, 588 A.2d 922, 932 (Pa. Super. Ct. 1991)).

The Pennsylvania Supreme Court has not addressed the requisite elements for maintaining a medical monitoring action in a beryllium exposure case, and it has not precisely defined the concept of a "significantly increased risk" in this context.  Defendants argue that there is no basis to conclude that the Pennsylvania Supreme Court would reach a result contrary to the Superior Court's decision in Pohl, especially since it rejected the opportunity to consider the plaintiffs' appeal in Pohl, as reflected in its denial of allocatur.

Defendants also note that trial courts in Pennsylvania have followed Pohl.  The Philadelphia County Court of Common Pleas created a beryllium docket due to the high volume of beryllium-exposure medical monitoring cases filed in that court.  This specialized docket includes cases filed by approximately 50 plaintiffs, including Mr. Zimmerman's wife, all of whom sought medical monitoring as a result of their alleged exposure to beryllium emissions from the Reading Plant.[12]

---

[12] These state court plaintiffs referred to above were represented by the same counsel that represents Mr. Zimmerman here.  Invariably, these plaintiffs sued the same companies who are defendants here, which are also represented by the same defense counsel.

The presiding judge in these cases, according to Defendants, rejected the exact arguments that Mr. Zimmerman advances here in granting summary judgment in 27 separate cases in the court of common pleas.  (See Def. Mem. Summ. J. Ex. 20; Def. Reply Br. Ex. 25.)  In four of these cases, Schlott, Harris, Young and Yatsko,[13] which were consolidated for at least certain pre-trial purposes, the court rejected the plaintiffs' primary argument, which is identical to the argument raised by Mr. Zimmerman here, namely, that because the plaintiffs were exposed, they are at a significant risk.  The presiding judge recognized Pohl as binding authority, thus compelling summary judgment as a matter of law for the defendants (the same Defendants here). (See  Def. Mem. Summ. J. Ex. 20; Schlott v. NGK Metals Corp., No. 1247, slip. op. at 2 (Pa. Ct. Com. Pl. Jan. 18. 2008.)[14]

In response to Defendants' argument that Pohl is binding on the Court here, Mr. Zimmerman contends, without providing any supporting argument, that Pohl is neither controlling nor persuasive authority.  He attempts to distinguish Pohl based on the ostensibly different proofs offered in each case.  Fundamentally, Mr. Zimmerman is left with the argument that the Pohl ruling is – or should be considered – narrow.

The Court is not persuaded by Mr. Zimmerman's arguments.  It is virtually inescapable

---

[13] Schlott v. NGK Metals Corp., et al., No. 1247 (Pa. Ct. Cm. Pl. May Term, 2003); Harris v. NGK Metals Corp., et al., No. 4388 (Pa. Ct. Cm. Pl. Jan. Term, 2003); Young v. NGK Metals Corp., et al., No. 0111 (Pa. Ct. Cm. Pl. Oct. Term, 2003); Yatsko v. NGK Metals Corp., et al., No. 2084 (Pa. Ct. Cm. Pl. Nov. Term, 2003).

[14] The common pleas court granted summary judgment in the defendants close to two dozen other cases following the court's January 18, 2008 decision in Schlott, relying on the findings and conclusions in Schlott as authority.  (See Def. Reply Br. Ex. 25.)

that Mr. Zimmerman essentially asks the Court, for all practical purposes, to "overrule" <u>Pohl</u>.[15]

Because the Court finds that <u>Pohl</u> represents a current and cogent statement of Pennsylvania law,

and Mr. Zimmerman's case falls within the dictates of <u>Pohl</u>, Defendants' motion will be granted.

Like the three plaintiffs in <u>Pohl</u>, Mr. Zimmerman has failed to demonstrate beryllium

sensitivity through positive BeLPT results. <u>Pohl</u> states that a plaintiff must have developed

beryllium sensitivity in order to pose a "significantly increased risk." <u>Pohl</u>, 936 A.2d at 51. To

be sure, Mr. Zimmerman attempted to avoid summary judgment by arguing that his one positive

BeLPT and his non-medically recognized "borderline" condition "significantly increase" his risk

of contracting CBD. However, all of Mr. Zimmerman's arguments and, notably, the expert

testimony he offers to support them, amount to the proposition that exposure alone creates a

"significantly increased risk." <u>Pohl</u> rejected that proposition.

The <u>Pohl</u> court already rejected Dr. Rossman's opinion, namely, that exposure to

beryllium alone places an individual at a significantly increased risk of contracting CBD. Mr.

Zimmerman's attempt to describe his condition as "borderline" in order to differentiate himself

from the plaintiffs in <u>Pohl</u> is both unavailing, because neither he nor the individual plaintiffs in

<u>Pohl</u> are sensitized, and irrelevant, because to accept Mr. Zimmerman's position the Court would

have to accept his argument that exposure alone creates a "significantly increased risk." The

Superior Court in <u>Pohl</u> also squarely rejected that argument.

In addition, the Court does not find persuasive Mr. Zimmerman's supposed "new"

---

[15] Plaintiff's counsel conceded at oral argument on the defense motion that in order to establish a medical monitoring claim for Mr. Zimmerman, the Court must disregard <u>Pohl</u> because, if <u>Pohl</u> controls, it compels the conclusion that Mr. Zimmerman has failed to show that he faces a "significantly increased risk" of developing CBD.

science and the additional expert testimony offered here that was not expressly offered in Pohl. The 2004 article by Newman, et al. is not the scientific "break-through," for purposes of this law suit, that Mr. Zimmerman hopefully suggests it is. The authors' conclusion that beryllium sensitization "merits medical follow-up" was fully considered by the Pohl court. In fact, it was squarely within its holding.

No doubt "beryllium sensitization" merits follow-up, both in the medical sense and the legal sense. The Pohl court understood that beryllium sensitization often progresses to chronic beryllium disease, and this understanding compelled that court's observation that individuals who have developed BeS are entitled to medical monitoring. Thus, the Newman article is not "new" science at all for the purposes of advancing Mr. Zimmerman's claims. Indeed, the Pohl court cited testimony from Dr. Maier, who is one of the co-authors of the article in question, in which she stated that beryllium sensitization "develops with [CBD] or before [CBD] is the current medical understanding." Pohl, 936 A.2d at 50-51 (emphasis added).

Mr. Zimmerman's argument, which was rejected in by the trial and appellate courts in Pohl, and was rejected by the common pleas court in the subsequent Schlott line of cases, is that exposure alone creates risk. In the context of airborne diseases, however, this proposition is a mere truism and under Pennsylvania law, exposure is but one of seven elements required to establish a medical monitoring claim.

During oral argument here, Mr. Zimmerman's counsel emphasized the toxicity of beryllium, focusing on the substance's capacity to wreak havoc on an exposed community, and cause suffering and disease. But the question remains - cause disease to whom? In this regard, the medical science has not changed since Pohl; as a matter of law, based upon the record

21

presented, Mr. Zimmerman is no more at risk than the plaintiffs in <u>Pohl</u> whose medical

monitoring claims were dismissed.  Plaintiff's own experts (including medical doctors and an

epidemiologist) admit that only a small fraction of the people who are exposed to beryllium will

develop CBD.  The trial and appellate <u>Pohl</u> courts struck and applied a balance between certain

competing interests involved in these types of cases, and concluded that beryllium sensitization is

the appropriate point on the beryllium exposure-to-disease continuum where a defendant's

liability should attach.[16]  Mr. Zimmerman and his counsel, no doubt deserving of respect for their

---

[16] The trial court in <u>Pohl</u> looked at a number of factors when examining the question of whether monitoring before or after BeS develops makes more sense, in the context of deciding whether to certify a class:

> The most disturbing aspect of this proposed class is the potential effect of certifying this as a proper class. The plaintiffs have proposed that the entire community of Reading, living in this geographical area for the periods in question be certified for medical monitoring even if they have a negative blood beryllium LPT. The plaintiffs' proposal indicates that the class has a life time risk of developing chronic beryllium disease and should be evaluated for the rest of their lives. This is true whether they have tested positively or negatively on the blood beryllium LPT in the past. Since the overwhelming medical evidence from all doctors was that less than one percent of the 200,000 people had any expectation, even if exposed to beryllium to develop the disease, we would be required under this theory to notify everyone of the 200,000 that they should take this test and provide them with significant medical documentation as to why. I cannot imagine such a result being a proper medical exercise. It simply fails to consider the fear that would be engendered in the individuals who could not get this disorder, even if they had extensive exposure.

> On the other hand, if any individual started to develop any symptoms, they could immediately file suit and bring any action they wished. If the court was permitted a balancing act, it is very clear that to scare this community would be an improper result. This community has had a long history of being offered tests of this kind, all the doctors in the community are aware of the dangers of chronic beryllium disease. In a thirty year period since the 1969 articles were published, only one article authored in August of 1991 by Dr. Lee S. Neuman and Dr. Catherine Kreiss, colleagues of the plaintiffs' experts at The National Jewish Medical and Research Center, reported a possible community case, but not at The Reading Plant. In the article, the authors reported that there had been no community cases in more than thirty years. The woman in question had a husband who worked in the plant and

zealous advocacy and high caliber written and oral presentations, have not made the case for finding that <u>Pohl</u> should not be followed.

**CONCLUSION**

The Pennsylvania Superior Court's <u>Pohl</u> decision represents the current state of Pennsylvania law on the issue of what constitutes a "significantly increased risk," which is a requisite element of a cause of action for medical monitoring, in the beryllium-exposure context. In Pennsylvania, a beryllium-exposed plaintiff must establish that he or she is "sensitized" to beryllium, i.e., has developed BeS.  Because it is undisputed that Mr. Zimmerman is not beryllium sensitized, his medical monitoring claim at this time fails as a matter of law.  If Mr. Zimmerman develops evidence in the future that he has been tested and determined to be beryllium sensitized he may then commence an action.  Accordingly, Defendants' motion for summary judgment will be granted.

An Order consistent with this Memorandum follows.

---

possibly had exposure from contaminated work clothes. Other than that one case reported in the literature, we now have the three cases diagnosed by Dr. Rossman of individuals who lived within a block of The Reading Plant. On balance, this Court finds a class action would not provide a fair and efficient method of adjudication.

<u>Pohl v. NGK Metals Corp.</u>, No. 0733, 2006 Phila. Ct. Com. Pl. LEXIS 472, at *45-47 (Phila. Ct. Com. Pl. Nov. 29, 2006).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SHIRLEY SHERIDAN et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **NGK NORTH AMERICA, INC. et al.,** | : | |
| **Defendants** | : | **No. 06-5510** |

**O R D E R**

    **AND NOW**, this __ day of September, 2008, upon consideration of the Motion for

Summary Judgment filed by Cabot Corporation and NGK Metals Corp. (Docket No. 102),

Plaintiff James Zimmerman's response thereto (Docket No. 108), Defendants' reply brief

(Docket No. 109), Plaintiff's surreply brief (Docket No. 110), and following oral argument on

September 5, 2008, **IT IS ORDERED** that:

1.    The Motion (Docket No. 102) is **GRANTED**.

2.    The Clerk of Court shall enter Judgment in favor of Defendants Cabot Corporation and

    NGK Metals Corporation, and against Plaintiff James Zimmerman.

                    BY THE COURT:


                    S/Gene E.K. Pratter
                    GENE E.K. PRATTER
                    United States District Judge